**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

OLAS V. ALLEN                                                                                                          PLAINTIFF

v.                                         No. 4:05CV01497 JLH

PETIT JEAN ELECTRIC COOPERATIVE
CORPORATION; THE NRECA GROUP BENEFITS
PROGRAM; and COOPERATIVE BENEFIT
ADMINISTRATORS, INC.                                                                                        DEFENDANTS

**OPINION AND ORDER**

Olas Allen filed this action pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for judicial review of a denial of long-term disability benefits. The parties have filed cross-motions for summary judgment. The defendants, National Rural Electric Cooperative Association ("NRECA") and Cooperative Benefit Administrators, Inc. ("CBA"), have filed an appendix of documents which contains the plan documents and the administrative record. The parties have also submitted cross-statements of undisputed facts pursuant to Local Rule 56.1.

**I.**

Allen worked as a field engineer for Petit Jean Electric Cooperative Corporation, a rural electric cooperative.[1] By virtue of his employment, Allen participated in a long-term disability plan sponsored by the NRECA and administered by CBA, NRECA's wholly-owned subsidiary. Allen's plan was a component of a single plan of welfare benefits called the NRECA Group Benefits Program, which granted CBA the "discretion and final authority" "to determine coverage and eligibility for benefits" and "to interpret and construe the terms of the Plans." Disability under the

---

[1] Petit Jean was dismissed from this action by joint stipulation on February 2, 2006.

long-term disability plan was defined as being "completely unable to perform any and every duty pertaining to the Participant's occupation with the Participating Cooperative."[2]

On February 3, 2004, Allen slipped and fell down an embankment at work, injuring his back. He was nearly 59 years old at the time. After his injury, he did not return to work but, instead, drew retirement and Social Security disability benefits and, on April 23, 2004, applied to CBA for long-term disability benefits.

Allen stated on his application that he was unable to perform the usual duties of his job because he was "not supposed to lift anything at this time." He described his usual job duties as staking, cutting center trails, and using transit equipment for surveying. He also answered that as a field engineer he was required to possess technical knowledge of the electrical system and special skills with regard to use of the transit and shooting grade, supervise one aide, and travel daily to wherever he was needed in the system. Physically, the job required him, in his estimation, to walk four hours, stand two hours, and sit two hours in a typical day and required him to lift and carry a chainsaw and transit equipment.[3] Petit Jean stated on the employer section of the form that Allen's "main job is to survey for new lines; prepare staking sheets and work orders; maintain system mapping; and check for problems with the system."

In addition to the job information provided by Allen and Petit Jean, CBA was given a four-

---

[2] The plan evaluated disability according to two standards: one, the "own occupation" standard quoted above; and another, the "any occupation" standard, applicable "after two years measured from the end of the Benefit Waiting Period." Only the "own occupation" standard is applicable in this case.

[3] Although the form parenthetically asked for the following information, Allen did not indicate how heavy the chainsaw and transit equipment were, how often he lifted them, or how far he had to carry them.

page job description.  The job description stated that Allen's job involved performing "survey work necessary for the design and location of electric distribution lines and substations."  In addition to many and various administrative and supervisory tasks, the field engineer "[s]upervises, or performs personally, the staking and surveying of line extensions, conversions and other system improvements"; and "performs personally or directs the performance of the following activities: "[t]rims trees and cuts brush for the staking of lines as is required or directed," "[p]roperly uses all engineering equipment and surveying instruments under supervision," "[p]repares staking sheets and work orders under supervision," "[c]hecks sag on constructed lines under supervision," and "[k]eeps system maps up to date under supervision," "[k]eeps engineering equipment clean and in good working condition."  In doing these duties, he "[d]irects the activities of personnel under his supervision (an engineer's aide) but devotes less than 50 per cent of his hours worked in the work week to activities of those supervised."

Allen informed CBA that he was under the care of Dr. Jose Abiseid, his family practitioner, and Dr. Steven L. Cathey, a neurosurgeon.  CBA requested from these physicians copies of Allen's medical records.  The submitted medical records show that Allen presented to Abiseid on February 5, 2004, with subjective complaints of lower back and neck discomfort radiating into his legs and objective signs of left back pain, muscle strain, and pain with movement.  Abiseid diagnosed low back pain and lumbar spasms, prescribed pain and anti-inflammatory medication, and recommended that Allen also use moist heat and do back exercises.  Abiseid also made the notation "off until Monday," presumably recommending that Allen remain off work.  On February 9, 2004, Allen presented to Abiseid with continued complaints of great discomfort in his lower back and inability to sit for any length of time and objective signs of continued, unchanged back pain.  According to

the notes, Allen reported that the pain medication worked for short times. Abiseid reiterated his findings, ordered an MRI, and noted "off until Thurs." On February 12, 2004, Allen presented with objective signs of continued low back pain and periodic numbness down his leg. Abiseid diagnosed the problem as "disc protrusions [at] L4-5" and low back pain, ordered the MRI report, and referred Allen for neurosurgical evaluation. Dr. Cathey, the neurosurgeon to whom Allen was referred, examined Allen on March 8, 2004. Objectively, Cathey found "no sign of lumbar radiculopathy" and noted that Allen's neurological examination was negative, his straight leg raising was negative bilaterally, and, although there was "point tenderness in the lower lumbar area on the left," there was "no paraspinous muscle spasm." Cathey stated that his post-injury MRI showed "some acquired canal stenosis at L4-L5" which appeared "to be due to a combination of facet arthropathy as well as a left paracentral disc herniation." Notwithstanding the MRI's own findings, Cathey noted that was difficult to see any obvious L5 nerve root impingement.[4] Cathey reported:

> [Allen] says that his pain has been a little better since he was taken off work. He was evaluated by Dr. Jose in Clinton and was started on Celebrex 200 mg. Unfortunately, the patient hasn't really taken the drug because he thought it might be "hard on his stomach."
>
> Mr. Allen relates some previous trouble with his lower back, as well as his cervical spine . . . . He says his lower back has given him trouble off and on for 20 years . . . .
>
> Since Mr. Allen really has had no treatment to speak of, I have arranged for him to PT on a daily basis for the next two weeks . . . .

---

[4] The MRI report stated:
Small left paracentral disc extrusion (rupture) at L4-5, with mild inferior subligamentous extension and diffuse annular disc bulging. This probably impinges upon the left L5 nerve root in the lateral recess. There is moderate central canal stenosis due to facet arthropathy, annular disc bulging, and ligamentum flavum thickening.

Cathey increased Allen's dosage of Celebrex and stated that Allen would remain off work pending a further evaluation. On March 16, 2004, Allen returned to Abiseid and reported that the physical therapy was not working. He followed up with Cathey on April 1, 2004, stating that "the pain in his lower back as well as his left hip has improved somewhat following a month of PT" and that the "Celebrex 200 mg b.i.d. was helpful." Cathey reiterated that the MRI showed "some mild, acquired canal stenosis at L4-L5," adding to the other objective findings that Allen "exhibits full range of motion of the lumbar spine without paraspinous muscle spasm." Finally, Cathey noted:

> Since Mr. Allen says his pain is getting better, I believe it is reasonable to wait this problem out a little while longer, particularly in view of the fact that the MRI scan does not show a tremendous amount of nerve root impingement. . . . I am going to extend his leave from work for another month. Mr. Allen tells me he may go ahead and retire at this point, but I am going to go ahead and allow him to start liberalizing his activities to see what effect, if any, this has on the pain in his lower back and left hip.

Abiseid completed an Attending Physician's Statement of Disability ("APS") on April 23, 2004, noting a diagnosis of "disc protrusion L4-5" and "small bulge @ L3-4" and treatment of pain medication, physical therapy, muscle relaxants, and daily anti-inflammatory medication. Abiseid marked that Allen's condition was unchanged during the course of examination and that no change was expected. As defined by the Dictionary of Occupational Titles, Abiseid classified Allen's condition as a Class 5 impairment, that is, a "[s]evere limitation of functional capacity; incapable of minimal (sedentary) activity (75% - 100%)." Finally, he marked that, although Allen was ambulatory, he was totally disabled from his own and any other job, was capable of performing none of the duties of his job, and that no future change in condition was expected.

Allen followed up with Cathey one more time on April 29, 2004. Cathey reported in a letter addressed to Dr. Abiseid:

5

> [Allen] returned today saying that he still has significant discomfort in his lower back. This, despite continuing to take Celebrex 200 mg b.i.d. Although he admits to having previous episodes of lower back pain, as well as trouble with his cervical spine, this particular episode has been the most protracted and recalcitrant to conservative treatment.

Allen's examination produced the same results as his past two examination, based on which Cathey concluded that he would not benefit from surgery or further physical therapy. Cathey referred Allen to a pain management specialist and stated:

> As far as his job is concerned, I am going to go ahead and extend his leave pending Dr. Meador's evaluation. Mr. Allen tells me today that he has no plans to go back to work for Petit Jean Electric and will probably just go ahead and taken [sic] retirement. Although he is not at MMI related to his occupational injury, I believe he will ultimately qualify for a 5% permanent partial impairment rating to the whole person referable to the structural changes noted in the L4-L5 disc. It is difficult to know, however, just how much the disc abnormality preexisted the February, 2004, injury, particularly in view of the fact that he concedes he has had lower back pain prior to the event.

CBA arranged for independent medical review by a neurosurgeon, Dr. Randy C. Jensen. In commenting on his review, Jensen noted that he had received the job description and duties of Allen's position, understood the plan's definition of disability as meaning "that the patient is unable to perform any of the duties of his occupation," and reviewed the records from Dr. Cathey.[5] By letter dated May 18, 2004, Jensen stated:

> After reviewing all these records, there does not appear to be any reason to allow this patient disability. There is no evidence in the provided documentation that the patient has met any aspects of the definition of plan language; therefore, it is my opinion that he should not be considered disabled.

CBA denied Allen's claim on June 2, 2004. The letter stated that they had referred the claim

---

[5] Nothing in Jensen's report specifies that he reviewed Dr. Abiseid's notes or the APS, but CBA had received those records and said in its log that it was going to forward the file for review.

to their consultant for medical review and that "[b]ased on the objective medical documentation we have received in support of your disability, there is no objective medical documentation that would substantiate you being disabled from your occupation as an Engineer." Allen appealed this denial on October 8, 2004. He included a copy of the notice of the disability benefit award issued to him by the Social Security Administration, but noted that he did not have any additional medical documentation. CBA upheld its initial denial on November 5, 2004. That letter stated that the social security disability determination "does not have a factor in our decision" and that "[s]ince there was no objective medical documentation submitted with the appeal, and the medical documentation we have does not support him being totally disabled from his occupation, we have no alternative but to deny your appeal."

Allen appealed the decision to the appeal committee on January 4, 2005. In the appeal letter, Allen's attorney pointed out that the definition of disability under the Social Security Act was at least as stringent as the plan's definition. He also stated that he was enclosing a list of medications and prescription records.[6] On February 22, 2005, Allen's attorney submitted a letter from Dr. Abiseid and the results of a January 2005 MRI. Allen's attorney further advised CBA that Allen had been examined by Dr. Richard Jordan and that Jordan was "in the process of scheduling him for surgery to relieve the nerve root impingement at L-5."

Dr. Abiseid's letter, dated February 8, 2005, summarized the MRI as showing "posterolateral left sided disc herniation at L4-5 impinging into the left L5 nerve root." Abiseid stated, "We are

---

[6] The Court is unable to locate these items in the administrative record. In a later review on April 4, 2005, Dr. Fabian noted that the record showed that Allen received hydrocodone on an inconsistent basis and that he had prescriptions filled on January 4, 2005, and on February, April, and May 2004. According to Fabian, the prescription records showed that Allen had "not had any narcotic refills in a year."

continuing medical therapy, however, it is my opinion he should have surgery on his back to hopefully take care of this problem and control his pain. He continues to be incapacitated with low back pain secondary to disc herniation at L4-5." The MRI report itself concluded that there were "degenerative disc changes at L2-3, L3-4, and L4-5 with a subtle posterolateral left sided disc herniation at L4-5, which should affect the left L5 nerve root, if it is of clinical significance."

On March 16, 2005, Allen's attorney submitted the letter opinion of Dr. Jordan, a neurosurgeon who treated Allen on February 8, 2005, for the first time since 2003. Dr. Jordan's letter, dated February 8, reported that Allen had received "fairly extensive conservative treatment," including various medication trials, physical therapy, and three epidural steroid injections. Jordan noted that the January MRI showed "lumbar spinal stenosis at L4/5 and to a lesser degree at L3/4 with foraminal compromise at both levels." According to Jordan, Allen presented with "limited lumbar range of motion on all planes"; "more pain with extension"; and tenderness over the SI areas but no sciatic notch tenderness. Jordan reported that Allen's walking was "somewhat limited to where he is only able to go about 40 yards up or downhill without exacerbating the pain" and that Allen "was not able to return to work." Despite the attorney's previous representation that Dr. Jordan was in the process of scheduling surgery, Jordan stated in his letter that no plans had been made that day for surgery. Jordan recommended only that Allen inform him if his symptoms worsened and report back in six months.

CBA arranged for a second independent medical review, this time by Dr. Henry F. Fabian, an orthopaedic surgeon. Fabian reported back to CBA on April 4, 2005. According to his report, Fabian evaluated the previous review, the records from Abiseid and Cathey, and the MRI, in light of his understanding of disability as an injury which "made the patient unable to perform any duties

of his occupation."[7] Ultimately, he agreed with Jensen's conclusion, noting in support Cathey's unfavorable conclusions, a lack of "supporting documentation," and insufficient records of comprehensive treatment. Fabian wrote:

> There is no documentation of comprehensive conservative therapy although it was stated in the letter from Dr. Abiseid that this patient had undergone various medication trials, physical therapy and also three epidural injections. The only record we have for meds shows the patient had received hydrocodone on an inconsistent basis for this. . . . [T]he patient has not had any narcotic refills in a year indicating that he has really not received any documented medication therapy in this time. There is also no documented physical therapy interventions for this patient. Therefore, I concur with the previous reviewer that the patient does not meet the criteria for total disability.

Fabian noted that "[i]f this is an issue for the patient I would recommend that he undergo an Independent Medical Examination which would include his ability to participate in work-related activities."

CBA arranged for Allen to undergo a functional capacity evaluation ("FCE") on July 12, 2005. Based on his performance during the FCE, the examiner concluded that he was able to perform work at the light level with certain limitations.[8] Allen's limitations were described as

---

[7] It appears that he reviewed Dr. Jordan's letter as well because he identifies statements from that letter as being made by Abiseid.

[8] The FCE report defined physical demand characteristics of work as follows, citing volume 2 of the Dictionary of Occupational Titles (4th ed. rev. 1991):

| **Physical Demand Level** | OCCASIONAL<br>0-33% of the workday | FREQUENT<br>34-66% of the workday | CONSTANT<br>67-100% of the workday |
|---|---|---|---|
| Sedentary | 1 - 10 lbs. | Negligible | Negligible |
| Light | 11 - 20 lbs. | 1 - 10 lbs. | Negligible |
| Medium | 21 - 50 lbs. | 11 - 25 lbs. | 1 - 10 lbs. |
| Heavy | 51 - 100 lbs. | 26 - 50 lbs. | 11 - 20 lbs. |
| Very Heavy | Over 100 lbs. | Over 50 lbs. | Over 20 lbs. |

follows:

> Mr. Allen did not demonstrate the ability to perform material handling (lifting/carrying) over the 20 lb. level and he did not exhibit the ability to crouch. Mr. Allen's general mobility is slower than the average worker and he required frequent breaks while performing work type activities. Mr. Allen exhibits no functional deficits with the use of his hands/arms for fingering, handling or reaching. He has poor tolerance to any repetitive bending or twisting and is limited to the occasional classification for these activities. He exhibits only moderate lumbar AROM deficits with formal evaluation. Mr. Allen is limited in ability to prolong stand to 30-40 minutes continuously before requiring a change to a seated position for 5-10 minutes.

The report also stated that Allen could walk, stand, and sit on a frequent basis and carry up to 20 lbs., push/pull cart, stoop, and kneel on an occasional basis. On a constant basis, Allen could balance, reach immediate, reach overhead, reach with weight, and handle and finger items.

On August 3, 2005, the appeal committee upheld the denial, finding that the information contained in the appeal file and the opinions expressed by the consultants, presumably Dr. Fabian and the FCE examiner who they quoted, demonstrated that Allen did not meet the definition of total disability from his own occupation.

Allen filed this action on October 12, 2005.

**II.**

The parties agree that the Court should review CBA's final determination for an abuse of discretion. An administrator's decision to deny benefits under an ERISA plan is reviewed under this standard if the plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989); *Clapp v. Citibank, N.A. Disability Plan (501)*, 262 F.3d 820, 826 (8th Cir. 2001). The plan documents submitted to the

Court grant CBA such discretionary authority and there is no contention that a less deferential standard otherwise applies.

Under an abuse of discretion standard, the Court reviews only evidence that was presented to the administrator. *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997). If the administrator's decision was reasonable in light of that evidence, that is, if it was based on a reasonable interpretation of the plan and supported by substantial evidence, the Court will uphold the decision. *King v. Hartford Life and Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005); *Clapp*, 262 F.3d at 828. The Court will not reverse the decision simply because a different reasonable determination could have been made. *Cash*, 107 F.3d at 641. "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Delta Family-Care Disability and Survivorship Plan v. Marshall*, 258 F.3d 834, 841 (8th Cir. 2001) (internal marks and citation omitted). Therefore, a reasonable determination is one that a reasonable person *could* have reached given the evidence before him, not one that a reasonable person *would* have reached. *Clapp*, 262 F.3d 828.

CBA denied Allen's claim for benefits because he did not meet the definition of total disability from his occupation. Substantial evidence supports this determination. Under the plan's relevant definition of disability, the participant must be "completely unable to perform any and every duty" of his occupation. Dr. Cathey offered no clear opinion on this subject. Although he extended Allen's leave for various amounts of time pending treatment, Cathey never commented on Allen's capacity to perform the functions of his job; by the time of his final examination of Allen, he was under the impression that Allen was going to take retirement. Dr. Abiseid did find Allen unable to work, as did Dr. Jordan – Abiseid stating that Allen was "incapacitated," "totally disabled" from his

and any job, and able to perform none of his job functions; and Jordan stating that Allen was "not able to return to work." On the other hand, the two reviewing physicians in this case, Jensen and Fabian, concluded that the evidence did not support a finding of disability. Both did so after presented with the plan's definition of disability and Allen's job duties.[9] Both relied on Dr. Cathey's finding of 5% permanent partial impairment and the MRI results. In addition, Fabian relied on the inconsistent and largely undocumented conservative course of treatment. In the Court's opinion, it was reasonable to rely on their conclusions. Even though the reviewing physicians' opinions conflicted with those of Allen's treating physicians, it was Fabian's and Jensen's opinions that found support in the FCE. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972, 155 L. Ed. 2d 1034 (2003) (holding that, under ERISA, treating physicians need not be afforded special weight in the face of conflicting opinions); *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 925 (8th Cir. 2004) (holding decision to reject treating physician's opinion reasonable in light of conflicting and reasoned opinion by reviewing physician); *Clapp*, 262 F.3d at 829 (same). CBA's decision was therefore supported by substantial evidence, even despite evidence of a Social Security Administration grant of benefits. *Farfalla v. Mut. of Omaha Ins. Co.*, 324 F.3d 971, 975 (8th Cir. 2003).

Medical evidence aside, Allen's main contention in this case is that his job is medium to heavy work and that, even acquiescing in the FCE report, certain duties of his job, namely trimming trees, cutting brush, lifting and carrying survey equipment, operating a chainsaw, and walking over the system's terrain, are inconsistent with the FCE's definition of light work. The FCE's definitions of physical demand levels were extracted from the 4th edition of the Dictionary of Occupational

---

[9] The same cannot be said for Abiseid and Jordan.

Titles.  According to Appendix C of this source, the full definitions of the various physical demand levels are as follows:

> S-Sedentary Work – Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.
>
> L-Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.
>
> M-Medium Work - Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work.
>
> H-Heavy Work - Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Medium Work.

Comparing these definitions and the information CBA was given regarding Allen's job duties, it was not unreasonable to treat the field engineer position as light work, as CBA implicitly did by relying on the FCE.  According to Petit Jean, Allen's main job was to "survey for new lines; prepare staking sheets and work orders; maintain system mapping; and check for problems with the system."  By Allen's account, his job required him to walk for 4 hours a day, stand for 2 hours, and

13

sit for 2 hours. In and of itself, this amount of walking is not inconsistent with light work, which may require "walking or standing to a significant degree." Nor is it inconsistent with the FCE, which concluded that Allen could walk on a "frequent" basis (34-66% of the day) so long as he was given breaks. Allen now emphasizes that the distribution system over which he is required to walk consists of "steep, rocky and timbered" terrain. This fact has some significance in light of Dr. Jordan and the FCE's findings. In his letter, Dr. Jordan noted that Allen's walking had been "somewhat limited to where he is only able to go about 40 yards up or downhill without exacerbating the pain." The FCE report noted that Allen "was functional with walking but demonstrates difficulty with inclines and declines." Nothing in the administrative record, however, would indicate to CBA that, even with these limitations, Allen would be precluded from performing any duty of his job. Since the primary decision was made by CBA, Allen should have presented his strongest case at the administrative level. *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 (5th Cir. 1994); *Davis v. Am. Gen. Life & Accident Ins. Co.*, 906 F. Supp. 1302, 1311 (E.D. Mo. 1995). On his claim, Allen stated that he could not perform the duties of his job because he was "not supposed to lift anything at this time." At no point in the administrative process did Allen communicate that an uphill or downhill walking limitation would affect his ability to work because of the system's terrain. Only now, when the record is closed, Allen implies that this is the case. Yet even now his arguments do not compel the conclusion that he would be completely unable to perform any duty of the job. The Court, as CBA, simply does not have any information from which it could make that determination.

As for lifting and carrying, Allen noted on his claim form that he was required to lift and carry a chainsaw and transit equipment. The form asked Allen to provide information regarding how heavy the items were and how often and how far he was required to lift or carry them; Allen failed

to do so. Later, during the FCE intake interview, Allen told the examiner that he was required to handle more than five pounds in his daily activities. There is nothing in the record, however, from which CBA should have determined that Allen's job required him to exert more than 20 pounds of force occasionally or more than 10 pounds frequently; as above, even Allen's arguments on summary judgment do not support that conclusion. On the record, it was reasonable to conclude that it did not. The job description states that Allen "[p]erforms personally or directs the performance of" tree trimming and bush cutting. Therefore, even if Allen's limitations prevent him from personally lifting and carrying the chainsaw to get through brush and lay the right-of-way, the record provides reason to believe that he could perform this function by supervising his aide.

While the Court does not necessarily agree with CBA's decision in this case, that decision is supported by substantial evidence and will not be reversed. Allen's motion for summary judgment will be denied. Document #31. The defendants' motion for summary judgment will be granted. Document #11.

IT IS SO ORDERED this ___30th___ day of May, 2006.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE